DICK RICHARDSON v. THE STATE.

*No. 3243.    Decided November 16.*

1. **Practice—Continuance—Diligence.**—Even when the application conforms strictly to the statutes, a continuance is not a matter of right, but is addressed to the sound discretion of the court. If, however, the continuance has been refused, and the accused convicted, and the absent testimony, in the light of the evidence on the trial, appears material and probably true, it devolves upon the trial court to award a new trial. See the opinion for a showing of diligence in an application for continuance, *held* sufficient as to one of the absent witnesses, and insufficient as to the other.

2. **Same.**—Article 564 of the Code of Procedure provides that "any material fact stated affecting diligence in an application for continuance may be denied by the adverse party. The denial shall be in writing, supported by the oath of some credible person, and filed as soon as practicable after the filing of the application for continuance." Failure to controvert the diligence when the application for continuance is filed will not preclude the State from doing so when it is again brought forward on the motion for new trial.

3. **Same.**—Article 565 of the Code of Procedure provides that "when a denial is filed * * * the issue shall be tried by the judge, and he shall hear testimony by affidavits, and grant or refuse the continuance according to the law and facts of the case." And article 781 of the same Code provides that when the truth of the causes set forth in the motion for new trial is controverted, "the judge shall hear evidence by affidavit or otherwise, and determine the issue." These provisions must be held to exclude all evidence on such issue except that provided by affidavit, or by testimony under oath, in open court.

4. **Same—Manslaughter—Charge of the Court.**—The application for continuance set out that the defense would prove by the absent witness Charlton that the deceased, a few days before the homicide, told him that the defendant was a "half negro and a bastard, and that his mother was a half negro and a whore, and had raised a family of bastards," of which statement the absent witness informed the defendant. The trial court held this proposed evidence immaterial because the defendant did not kill the deceased immediately upon next meeting him. But the testimony tends to show that the defendant's first subsequent meeting with the deceased was at a party on the fatal night; that when he discovered the presence of the deceased at the party he declared his intention to ask him if he meant what he had been saying about him, defendant, and his family; that during the evening he went out of the house upon the invitation of the deceased, and asked deceased.if he meant what he had been saying about him and his family; that deceased replied, " Yes, I mean every damned word of it!" and drew, cocked, and snapped a pistol at defendant, whereupon defendant inflicted the fatal cut. *Held:* Notwithstanding the failure of the defendant to kill the deceased

immediately upon meeting him at the party, the proof fairly raised the issue of man-slaughter, basing the adequate cause upon the new and not the former provocation; rendered the testimony of the absent witness Charlton material and probably true, and demanded of the court a charge applicable to the case as made by said proof. See the opinion *in extenso* on the question.

5. **Same.**—In all trials for murder it is the imperative duty of the trial court, in its charge of the jury, to define the term "malice," and omission to do so is error.

APPEAL from the District Court of Hunt. Tried below before Hon. E. W. Terhune.

This conviction was in the second degree for the murder of John Ladd, and the penalty assessed by the verdict was a term of sixteen years in the penitentiary.

The evidence pertinent to the rulings of this court is sufficiently stated in the opinion.

*M. M. Brooks, S. D. Stinson,* and *Sherrill & Austin* for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—This appeal is from a judgment of conviction for murder of the second degree.

Defendant made his first application for continuance on account of the absence of two witnesses, John Crane and W. E. Charlton. Defendant was arrested and placed in jail on the 5th of July, and on the 8th, as soon as he had employed his counsel, he sued out process for his witness Crane to Hunt County, the county of his alleged residence and the county of the trial, which process was returned into court on the 12th not executed, the witness not being found after diligent search. This application for continuance was presented to the court on the 15th, the day of the trial, and three days after the return of the process. It alleged that at that date Crane was temporarily absent from the State.

As to the absent witness Charlton the defendant sued out an attachment to Rains County, the county of the said witness's residence, on the 10th day of July, which attachment was returned on the 12th not executed. After the return of process in both instances on the 12th, defendant took no other steps within the next three days to secure the testimony or the presence of said witnesses. It appears that the witness Crane, several weeks prior to the trial, started to Washington Territory with cattle, but whether to remain there and become a citizen permanently was not known, and the witness himself had not finally determined. In either event it would have been impossible to take and return the deposition of the witness in time for the trial of the case. If it had been shown that the witness had permanently removed to and settled in Washington Territory, and this fact might have been ascertained by de-

fendant, then indeed due diligence would require that the proper effort had been made to take his deposition as authorized by the Code. Code Crim. Proc., art. 764, *et seq.;* Bowen v. The State, 3 Texas Ct. App., 617. Such diligence, however, could be excused where it is made to appear that by the use of such due diligence the testimony by deposition of said witness could not have been obtained in time for the trial. Hennessy v. The State, 23 Texas Ct. App., 340; Willson's Crim. Stats., sec. 2164. This we think was apparent in this case, and the diligence was sufficient as to the witness Crane.

As to the witness Charlton the diligence was not perhaps as strict as it might and probably should have been, the fact being that another attachment, if sued out promptly after the return of the first, in all probability could have been or might have been served upon the witness, had he been in Rains County. Jackson v. The State, 23 Texas Ct. App., 183. Thus it appears that the diligence as to one witness was sufficient, whilst it was insufficient as to the other. When all the statutory requirements have been complied with in the application a continuance is not, under our present law (Penal Code, art. 560, subdiv. 6), a matter of right, but its truth, merit, and sufficiency are, notwithstanding, still matters to be passed upon and within the sound discretion of the court. But if the continuance be refused, and the defendant be convicted, the court is required to grant a new trial where the absent testimony appears material and probably true; and if the absent testimony, in view of the evidence adduced on the trial, appears material and probably true, the fact that the application failed to comply strictly with the requirements of the statute should not defeat the granting of the new trial. And especially is this so with regard to the strictness of the diligence used. Willson's Crim. Stats., section 2186; Simmons v. The State, 26 Texas. Ct. App., 514; McCline v. The State, 25 Texas Ct. App., 247. Of course if there has been a total want or a gross neglect in the exercise of diligence the defendant would not be entitled to have either his application for continuance or motion for new trial on this point considered. In such case he could have no ground of complaint.

"Any material fact stated affecting diligence in an application for continuance may be denied by the adverse party. The denial shall be in writing, and shall be supported by the oath of some credible person and filed as soon as practicable after the filing of the application for a continuance." Code Crim. Proc., art. 564. And "when a denial is filed * * * the issue shall be tried by the judge, and he shall hear testimony by affidavits and grant or refuse the continuance according to the law and the facts of the case." Code Crim. Proc., art. 565. In this case the State did not controvert the diligence as above provided, nor in fact was the application controverted at all in the first instance. Still this did not preclude the State from controverting it as to diligence on the

motion for a new trial.    Walker v. The State, 13 Texas Ct. App., 618;
Jetton v. The State, 17 Texas Ct. App., 311.

Where the truth of the causes set forth in the motion for new trial is
controverted the practice is for "the judge to hear evidence by affidavit
or otherwise and determine the issue."    Code Crim. Proc., art. 781.    In
this case the motion for new trial was controverted, and especially so
with reference to defendant's application for continuance.    Defendant
saved a bill of exceptions to the overruling of his application, to which
the learned trial judge appends a lengthy explanation of the reasons
which actuated him in his ruling in refusing the new trial, in so far as it
was based upon this application for a continuance.    After he had over-
ruled the application, and during a recess of court, he says he saw and
conversed in person privately with the father of the absent witness Crane,
and the father told him (the judge) that he had heard his son tell what
he knew, and that his son did not see the difficulty nor any part of it.
The judge says he did not believe the witness Crane would testify as set
out in the application, and if he did, he did not think such testimony
would be true or probably true.

We are not satisfied even as to the propriety of a judge privately seek-
ing information as to a matter of fact pending before him for decision.
Such statements are hearsay, and are not legitimate evidence.    His de-
cision on the motion for new trial should be based upon *the evidence he
has heard by affidavit or otherwise.*    Code Crim. Proc., art. 781, *supra.*
It must be *evidence* testified or sworn to on the hearing before him, and
where the witness's statements, credibility, and means of knowledge can
be fully and legally ascertained.    *Ex parte,* independent, and unsworn
statements should not be allowed to override a defendant's sworn state-
ment.    The judge might, if he deemed proper, have called Crane's father
to the stand if he knew or had any reason to believe that said Crane knew
facts important and pertinent to the issue, and thereby have given de-
fendant a right to subject him and his statements to the legal tests ap-
plied generally to witnesses and their evidence, if he had so desired.    We
have only animadverted upon this matter because the trial judge in his
explanation has expressed a desire that we should prescribe some rule in
the premises.    We have no hesitancy in saying, however, that in so far
as the absent witness Crane was involved in the contest over the motion
for a new trial, in our opinion, his decision holding that the said testi-
mony would not be given by the witness if present, and that if given it
would not probably be true, is correct and fully supported by the affida-
vits of the witnesses Jackson, Kinsingham, and Harlow.

As to the absent witness Charlton, by whom defendant proposed to
prove that late in the evening before the homicide said witness told de-
fendant of insulting language used by deceased towards the mother of
defendant, in his explanation the learned judge, as one of his reasons for

not believing that the proposed testimony was probably true, or that Charlton ever had such conversation with defendant, says that the accused testified in his own behalf, and that he does not testify that Charlton told him anything. In this the learned judge is certainly mistaken, because in the statement of facts approved by him as correct, we find in the testimony of the defendant that he speaks of going to Black Jack Grove, and says, "I also had a talk with W. E. Charlton, who told me about the same thing that John Smith did about Ladd's talk concerning me and my mother." And in the contest over the new trial two of defendant's witnesses, Halbrook and Parham, state in their affidavits that they were at Black Jack Grove, and defendant was there until late in the afternoon, and that they saw him in conversation with Charlton.

But the court further says that said testimony, if true, was not material, because the evidence in the case failed to show that defendant killed the deceased upon his first meeting with him after he had been informed of the insulting language used by deceased towards his mother, and that therefore defendant could not legally avail of such "adequate cause" to reduce the killing to manslaughter. Penal Code, art. 598; Melton v. The State, 24 Texas Ct. App., 47; Parker v. The State, Id., 61; Norman v. The State, 26 Texas Ct. App., 221; Willson's Crim. Stats., sec. 1022.

In his testimony the defendant says, "I left town and went to Mr. Cal Rippey's, where there was a party. I did not know that Ladd would be at the party, but after I had been there for quite a while I saw him. Some time after I got there Ladd came to me and said he wanted to see me. I told him to wait a minute. At that time I was talking to some one in the hall. After a few moments, when the conversation was concluded, I turned and said to him I was ready, and what did he want. He said he wanted to see me, and I went out of the north hall door with him. He went in front of me, and as he walked off the steps leading to the cistern he put his right hand under his coat about his hip pocket. We walked out close to the cistern and stopped, and when I said to him, 'Do you mean all you have been saying about me and my mother?' and he replied, 'Yes, I mean every d—d word of it,' and immediately drew his pistol, cocked it, and presented it, and snapped it at my head. I knocked the pistol up with my left hand, and I think I knocked it out of his hand, and stabbed him with my right. I do not know whether I knocked the pistol out of his hand or not. When I stabbed him he turned and ran round the house. I left soon thereafter."

The State's witness Huff says that a short time before the difficulty, while he and defendant were out in the yard together, the defendant said, "I see John Ladd here. I am going to ask him if he means what he has been saying about me and my family."

State's witness Love testified that he saw defendant walk up to Ladd,

touch him, and tell him he wanted to see him, and they went out together.

Thomas Center, defendant's witness, relates the matter pretty much as defendant does, and he says that after they had walked out and off the gallery, he heard defendant say, "John, do you mean all you have been saying about me and my folks?" and Ladd replied, "Yes, I mean every damned word of it," and he says he heard a pistol click and snap. The insulting language used by deceased was that defendant's mother "was a part negro, a whore, and had raised a family of bastard children, and that defendant was a half negro." Several witnesses testified to having heard deceased use this language, and the application for continuance stated that the absent witness Charlton had told defendant about dark at Black Jack Grove that deceased had used this language, and that such would be his testimony.

The court says the testimony became immaterial because defendant did not kill deceased as soon as he met him. Suppose he did not kill him as soon as he first met him, but suppose that he doubted that deceased had or could have used such language, notwithstanding he had been so often told that he had, and that he determined to satisfy his own mind by asking him in person about it, and that upon his doing so the deceased repeated the language to him in person. Was not that a new and aggravating insult, and one doubly calculated to inflame his mind to such a degree of passion as to render it incapable of cool reflection? And suppose he acted upon that, and not upon the previous provocation, was that any the less an adequate cause because it was repeated to him in person? A man may well doubt that it is possible that another could have defamed his wife or mother until he has it confirmed from his own lips, and to hear him utter the defamatory language with his own lips is far more insulting than to have reports of such insults come at second hand from a thousand reliable sources. Some men, perhaps, under the circumstances would not have waited as defendant did, but would have slain deceased upon the information he had already received. This does not alter the question. If defendant asked the deceased out of the house for the purpose of ascertaining from him whether or not he had used the insulting language about his mother as he had been informed, and deceased, in reply to his question, stated that he had said and meant every word imputed to him, and the defendant, under the immediate influence of the sudden passion this insulting language aroused slew him, he would only be guilty of manslaughter, provided the jury believed the passion was such as to inflame his mind so as to render it incapable of cool reflection. Willson's Crim. Stats., sec. 1022; Williams v. The State, 24 Texas Ct. App., 637; Eanes v. The State, 10 Texas Ct. App., 421. As tending to show that the killing was on account of the insulting language to his mother, and for no other cause, we are of opinion that the proposed tes-

timony of the absent witness Charlton was both material and probably true, in the light of the other evidence in the case.

We are also of opinion that the charge of the court failed and omitted pertinently and affirmatively to instruct the jury upon that phase of the law of manslaughter, which we have above indicated. Nowhere in the charge were the jury told what would be the law if defendant called deceased out or went out on invitation of deceased, and then asked him concerning the insulting language and deceased repeated the same in person to him, thereby offering a new insult. Nor was this precise phase of the case presented in any of the refused instructions.

Again, defendant has been found guilty of murder of the second degree. Now, whilst malice does not enter into nor become an element of manslaughter, it is one of the main constituents of all murder, and the rule is well settled that in all trials for murder the charge of the court should explain the term *malice*. Babb v. The State, 12 Texas Ct. App., 491; Caruthers v. The State, 13 Texas Ct. App., 339; Willson's Crim. Forms, 708, 709. The learned trial judge has omitted to explain the term malice to the jury in his charge, and the charge is therefore defective.

For the several reasons above indicated the judgment is reversed and ·cause remanded.

*Reversed and remanded.*

Judges all present and concurring.